## Case No. 420.

### The ANNIE H. SMITH.

[10 Ben. 110.][1]

District Court, S. D. New York. Oct., 1878.

DISAGREEMENT AMONG SHIP OWNERS — SALE OF SHIP ON APPLICATION OF HALF OWNERS—CHARTER EVIDENCE—MORTGAGE.

1. The admiralty has jurisdiction to order the sale of a vessel on the application of the own-

[1][Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

ers of one-half of her, in case of a disagreement between them and the owners of the other half. But such disagreement must be such as prevents the present employment of the ship, and the owners asking for a sale must either propose a different employment of the ship, or, if they merely object to the voyage or the master proposed by the other moiety, their objection must be based on reasonable ground.

[Cited in The B. F. Woolsey, 7 Fed. 116.]

[See note at end of case.]

2. The owners of half of a ship applied to the court for a decree of sale. It appeared that, at the time of filing the libel, the ship was loading in New York under a charter for San Francisco. Some of the owners of the vessel resided in New York and some in Maine, and when she had been in New York before, some of her business had been done by S. & Co., who, together with the father of S., owned and controlled one-half of the ship. S. had accepted this charter while the vessel was yet at sea, after a conference with his father who was in Maine, and made some effort to consult with the Maine owners. After the charter had been accepted L., who represented the owners of the other half of the ship, came to New York and, having inquired of S. if she was chartered and received an evasive answer, then informed S. that, as representing the owners of the other half, he did not wish the ship chartered. S. then told him the ship was chartered. L. did not then repudiate the charter or take any steps to prevent the signing of the charter party by the master, which was done after the arrival of the ship in New York. There was dissatisfaction on the part of L. and those owners who acted with him as to the agency of S. & Co. or the father of S., and as to some previous transactions in reference to the ship; and after the vessel was partly loaded, L. and the other owners for whom he acted filed a libel against the ship and the owners of the other half to obtain a sale: *Held,* that, under the circumstances of the case, the libellants had not shown sufficient grounds to call on the court to exercise the discretionary power of sale.

3. That evidence tending to show that as to part of the vessel, to which L. held the legal title, the master of the vessel held an equitable interest by reason of which he had intervened in the cause and answered, opposing the sale, was admissible in order to show to the court all the circumstances in the face of which it was called to exercise its discretion.

In admiralty.

R. D. Benedict, for libellants.

W. W. Goodrich and W. R. Beebe, for respondents.

CHOATE, District Judge. This is a suit of licitation and partition brought by the owners of a moiety of the ship Annie H. Smith, against the ship and the owners of the other moiety. The libel prays a sale of the ship under the decree of the court and the distribution of the proceeds among the owners. That the courts of admiralty have jurisdiction of such a suit, seems to be settled by authority, so far as this country is concerned. There are three reported cases in which the court has entertained such a suit, and granted the relief here prayed for. They are the case of The Hope in the district court of South Carolina in 1793, [Case No. 12,927,] the case of The Seneca in the circuit court for the eastern district of Penn-

sylvania in 1829, [Case No. 12,670,] and the case of The Vincennes in the district court of Maine, in 1851, [Case No. 16,944.] These decisions have received the emphatic approval of eminent text writers as being in accordance with the principles of the maritime law. Story, Partn. § 438; Ben. Adm. (2d Ed.) § 274; 2 Pars. Shipp. & Adm. 343; Dun. Adm. Pr. p. 67; 2 Kent, Comm. 370.

In the case of The Seneca, [supra,] Judge Hopkinson, of the district court, denied the relief on the ground that the court had not jurisdiction, and the English court of admiralty has also declined to exercise this power, but the great weight of authority is in favor of the jurisdiction; and in cases where the relief is shown to be necessary, the sale by decree of the court seems to be the only practicable means of restoring the ship to its proper use as a vehicle of commerce, and therefore highly beneficial to those public interests which are peculiarly the care of the admiralty. The fact that the power is not exercised in England may be accounted for, perhaps, by the well known restrictions to which the jurisdiction of the English admiralty courts was subjected in early times through the jealousy and the greater power of the other courts. This power of sale, so far as the cases have gone, has only been exercised where the owners are equally divided in respect to the employment of the ship or appointment of the master. Where they are unequally divided, the rights of the majority and minority owners respectively are for the most part well settled. The majority in interest have the right to employ the ship in navigation, notwithstanding the objection and protest of the minority and their refusal to join in the adventure, but in such a case the minority may require security for the safe return of the vessel. If the majority in interest unreasonably refuse to employ the ship, it has been suggested that a sale may be enforced. Willings v. Blight, [Case No. 17,765.]

Of the cases where a sale has been decreed upon a disagreement between equal moiety part owners, the case of The Seneca [supra] is the only one reported with sufficient fullness to show the particular circumstances under which the power was exercised, and the views of the court as to the reasons and grounds for the exercise of the power to decree a sale as between the equal part owners, which reasons and grounds must, of course, limit and control the action of the court, in ordering or refusing a sale in each case presented to it. In the case of The Seneca, [supra,] the respondent was owner of one-half of the vessel, was in possession of her, and had made several voyages in her as master, to the dissatisfaction of the owners of the other half, whose interest the libellants had purchased; and he had projected another voyage, and insisted on fitting her out at great expense, and upon going in her as master. The libellants on the other hand

had refused to incur any expense for the outfit of the vessel for a voyage to be conducted by the respondent. They had appointed or attempted to appoint another master, and were ready and willing to employ the ship. It is obvious that the disagreement between the part owners in that case was such in its nature and effect, under the circumstances in which the vessel was placed, that it operated effectually to prevent the present use or employment of the vessel at all in navigation. The parties being equal in their right to control the employment of the ship and the appointment of the master, the effect of the disagreement was, as Mr. Justice Washington distinctly points out [Case No. 12,670] that "the vessel must remain unemployed, since neither owner can otherwise than tortiously send her to sea against the will of the other."

I think, also, that it is clear from the report of the case, that it was the opinion of that learned judge, that the power of the court to interfere and order a sale depends upon this as an essential and controlling element: that in the situation of the parties and the ship, as existing when the suit is brought, the ship cannot rightfully be sent to sea by either party. And it also appears from the authorities upon which he relies as supporting his opinion, that such is the ground or one of the chief grounds upon which the power to sell rests, as the same has been declared or recognized in the foreign maritime codes to which he refers. Thus he cites with approval, the following statement of the provisions of the Roman Marine Code: "(1.) That the opinion and decision of the majority in interest of the owners concerning the employment of the vessel is to govern, and, therefore, they may on any probable design, freight out or send the ship to sea, though against the will of the minority. (2.) But if the majority refuse to employ the vessel, though they cannot be compelled to it by the minority, neither can their refusal keep the vessel idle, to the injury of the minority, or to the public detriment; and since, in such a case, the minority can neither employ her themselves, nor force the majority to do so, the vessel may be valued and sold. (3.) If the interest of the owners be equal, and they differ about the employment of the vessel, one-half being in favor of employing her, and the other opposed to it, in that case the willing owner may send her out." He also cites the 6th article of the Marine Code of France, said to have been published as early as 1681, as follows: "No person can constrain his partner to proceed to the public sale of a ship held in common, except the opinions of the owners be equally divided about the undertaking of some voyage." And he also cites and accepts as just and reasonable, Valin's commentary on this rule, as follows: "The case excepted in this article is where the opinions of the parties are equally divided on the undertaking of some

voyage, upon which we may remark, that the question is not of two equal opinions, of which one is to leave the vessel without any kind of voyage, and the other to undertake such or such a voyage, there being no doubt in that case, that the opinion favorable to a voyage ought to prevail, saving the right to discuss the projected voyage; but solely of the case of two opinions equally divided upon the particular enterprise projected by one moiety of the persons interested, and rejected by the other moiety; whether that moiety proposes, on its part, another voyage, or confines itself to a disapproval of it, provided, nevertheless, that it gives plausible reasons for its conduct; otherwise this would have the air of an absolute refusal to permit the vessel to be navigated, which justice could not tolerate, being contrary to the object of the vessel, to the original intention of the parties, and the interests of commerce." The particular point of disagreement in the case of The Seneca, [supra,] was, as to who should go as master; and Mr. Justice Washington held that although not expressly mentioned in these foreign codes, the case was within their reason, because a disagreement as to the master operated as effectually as a disagreement as to the voyage to be undertaken, to prevent the ship from being sent to sea; and he held further, that if the moiety objecting to a master, honestly entertained an objection to him, on the ground of their want of confidence in his skill or integrity, they did assign a plausible reason for their conduct. From this case, therefore, and the authorities on which it rests, may be deduced these rules, as governing and limiting the exercise of this power of sale on the application of a moiety of the owners: First, that the disagreement must be such as prevents the present employment of the ship in navigation; and, secondly, that the objecting moiety asking for a sale, must either propose a different employment of the ship, or, if they merely object to the voyage or the master proposed by the other moiety, their objection must be based on reasonable grounds. And this result is entirely in accordance with the principles applied by courts of admiralty in dealing with the rights, duties and powers of part owners of ships, whether equally or unequally divided in opinion, and which are well expressed by Judge Peters, in the case of Willings v. Blight, [Case No. 17,765:] "It is a principle discernible in all maritime codes, that every encouragement and assistance should be afforded to those who are ready to give to their ships constant employment, and this not only for the particular profit of owners, but for the general interests and prosperity of commerce. If agriculture be, according to the happy allusion of the great Sully, 'one of the breasts from which the state must draw its nourishment,' commerce is certainly the other. The earth, the parent of both, is the immediate foundation and support of the one, and ships are the

moving power, instruments and facilities of the other. Both must be rendered productive by industry and ingenuity. The interests and comforts of the community will droop, and finally perish, if either be permitted to remain entirely at rest. The former will less ruinously bear neglect and throw up spontaneous products; but the latter requires unremitted employment, attention and enterprise, to insure utility and profit. A privation of freight, the fruit and crop of shipping, seems therefore to be an appropriate mulct on indolent, perverse, or negligent part-owners. The drones ought not to share in the stores acquired and accumulated by the labor, activity, foresight and management of the bees. Although the hive may be common property, it is destructively useless to all if not furnished with means of profit and support by industry and exertion, which should be jointly applied by all before they participate in beneficial results. Nor should the idle and incompetent be permitted to hold it vacant and useless, to the injury and ruin of the industrious and active."

Turning now to the facts of this particular case, it will be seen that the libellants' case does not come in either particular within the rule thus established by the case of The Seneca, [Case No. 12,670,] the disagreement between these part owners does not operate to prevent the present employment of the ship, nor do the libellants, the party objecting to the employment of the ship proposed by the other moiety, either propose any other employment, or allege or show any plausible grounds for objection to that proposed by the other party. The libel alleges, as to the points of difference between the parties, as follows: "That the owners of said ship are unable to agree in reference to the business and employment of said vessel. That, while the vessel was at sea on a voyage to New York, the libellants notified the respondents that said vessel must not be chartered, and the said respondents agreed that some arrangement should be made between the owners of the vessel with reference to the employment and control of her after her arrival in the port of New York. That thereafter the said vessel arrived in this port, where she still remains, but that the respondents refuse to make any reasonable arrangements with libellants as to the management of her. * * * That the master of the said vessel is acting with the said respondents, and that the respondents, with said master, intend to send the said vessel from this port on a voyage to the port of San Francisco, from which voyage these libellants have expressly dissented."

It will be seen that the averments of the libel are very indefinite as to the nature of the libellants' dissatisfaction. They express no want of confidence in the integrity and skill of the master, nor do they ask for his removal. They allege the prohibition by themselves of the chartering of the vessel, and the intention of respondents to send her to sea upon a voyage from which they have dissented; but they do not allege the grounds of their objection to the voyage proposed, nor allege that they intend to use her in any different employment. The libel, therefore, might be open to objection, under the rules above stated, as not making out a case; but the cause has been tried and argued, without reference to the sufficiency of the pleadings, and will be considered and determined, upon the evidence independently of any want of averment in the libel.

A brief statement of the history of the transactions between the parties in reference to this ship is necessary to the understanding of the points raised.

On the 10th December, 1875, Nickerson & Rideout, ship builders of Calais, Maine, entered into a written agreement with Capt. Bartlett, a shipmaster, to build a ship of certain dimensions, description and materials. The agreement was in form between Nickerson & Rideout of the first part, and Bartlett and the several "undersigned" of the second part. In point of fact, no subscribers were found to sign and become parties to it till long afterwards. Nickerson & Rideout agreed that the hull, spars and iron work should be finished and delivered at Calais on or before November 5th, 1876, free of all liens. The parties of the second part agreed to take the proportional parts set opposite their names, and to pay for the same at the rate of $33 per ton in certain installments, the title to vest in the subscribers in proportion to the several interests and amounts paid. It also provided that Nickerson & Rideout should pay no commission for superintending the construction, and Nickerson & Rideout joined with Bartlett in a guarantee that the subscribers should not have to take any larger proportion of the vessel than that for which they signed. Capt. Bartlett signed the agreement without adding to his signature any amount. In fact this agreement was devised by Bartlett and the builders as a scheme for getting a ship built for Bartlett to command, and with the expectation that they would find other parties to join with them to take shares and thus furnish the means for its construction. The plan was for Capt. Bartlett to superintend the building of the ship without compensation, except such as should result to him from the success of the adventure in his employment as master, and in such interest as he should be able to take in the ship. In June, 1876, Capt. Bartlett interested in the enterprise F. H. Smith & Co., of New York, shipping agents and commission merchants. Wm. H. Smith, the father of F. H. Smith, a New York merchant and ship owner, and Chas. N. Lord, of Bangor, Maine, a banker. They were all personal acquaintances of Bartlett's and had all formerly lived at Bangor. The first to sign the contract was F. H. Smith & Co,. who signed for 1-16. Then Lord

signed for ⅛, and Morse & Co., of Bangor, whom he brought in, for ⅛. Then one Laighton for 1-32, and W. H. Smith for 3-16. These were all the parties that signed the contract, taking in all 34-64 of the ship. I think the evidence is sufficient to show that it was held out by Capt. Bartlett, as an inducement to F. H. Smith & Co., and to W. H. Smith, to sign, that the firm of F. H. Smith & Co. would be employed to attend to the business of the ship when she should be in New York, and that this was made known to Lord, Morse & Co. and Laighton when they signed the contract. Such employment was in the line of business of F. H. Smith & Co. These parties signed about the same time, about the 19th of June, 1876. The interest of ⅛ each, taken by Lord and Morse & Co., was subscribed for by them in pursuance of the terms of a written agreement between them and Capt. Bartlett, executed on the same day with their execution of the building contract. This agreement recites that Lord and Morse & Co. "at the special instance and request, and for the special benefit" of Bartlett, had signed the building contract to take one-quarter of the said ship. By it Lord and Morse & Co. agreed that "after the performance of the provisions of the agreement on Bartlett's part, they would convey to him" whatever of said interest in said ship shall remain unsold, "and would reassign" all collaterals named in the agreement not appropriated by the terms and spirit of the agreement. It was then agreed, on Bartlett's part, to keep the interest insured, and to repay any taxes paid thereon by Lord and Morse & Co., and that, whenever Lord and Morse & Co. should sell said quarter, or any less portion, they should deduct from the sum received the following commission: from sale of a quarter, $1,500; one-eighth, $800; one-sixteenth, $400; that commissions and interests on all moneys paid out by Lord and Morse & Co. were to be allowed to them as follows: 1½ per cent on the whole sum paid for the one-quarter, 1½ per cent for advancing every six months, and 10 per cent per annum, payable semi-annually on all balance due, until paid, including in advances all sums paid for repairs and disbursements, and crediting earnings received. Bartlett agreed to pay one-half of all moneys paid out under the contract, with interest and commissions, within two years, and the balance within three years from the date of the contract. Bartlett then agreed to assign to Lord and Morse & Co., as security for his faithful performance of the agreement, all his interest in the estate of one Pollard, valued at $3,400, and a policy of insurance on his life for $3,000, which he agreed to keep in force. The agreement then provided that, if Bartlett neglected and refused to pay the interest semi-annually, except when he was at sea, and then within two months after his arrival at his next port of destination, then Lord and Morse & Co. should be entitled to hold the sum of $4,000 of said collaterals as a forfeiture for the non-payment of interest. Upon the execution of these agreements, Bartlett transferred the collaterals mentioned to Lord and Morse & Co., and Lord and Morse & Co. made their first advances towards building the ship.

Some two months after these transactions Nickerson & Rideout failed. Meanwhile, some further interests had been taken in the vessel. W. H. Smith took a quarter, and there remained 9-64 not taken, on which, by an agreement between Nickerson & Rideout on the one side, and Lord and Morse & Co. and W. H. Smith on the other, these parties had advanced on the 9-64, leaving, however, in Nickerson & Rideout a right to redeem the interest on paying up the advances. The failure of Nickerson & Rideout made it necessary to make arrangements with other parties for completing the ship, and increased the cost of the ship to the subscribers. Proceedings were taken to enforce claims for liens by several parties who had furnished materials for the ship, among others by F. H. Smith & Co., who had an unpaid claim for hard pine, amounting to about $10,000. W. H. Smith acted in the matter of this claim for a lien for F. H. Smith & Co., and the asserting of this claim caused some dissatisfaction on the part of Lord and Morse & Co. with W. H. Smith. And, after some verbal agreement between them, and some misunderstanding as to what that agreement was, Smith agreed, in writing, not to enforce this lien against their quarter interest. Nickerson & Rideout finally went into bankruptcy, and their right to redeem the 9-64 passed to their assignee. From the time of this difficulty about the hard pine, Lord and Morse & Co. began to entertain some hostile feelings towards the Smiths, and were determined, if they could, to prevent the Smiths, who already owned one-half the vessel, from acquiring any further interest. W. H. Smith was desirous of keeping the whole or a part of the title to the 9-64, on which he, with Lord and Morse & Co., had advanced, but which stood in the name of W. H. Smith for 3-64, Lord for 3-64, and Morse & Co. for 3-64, and he took an agreement from Nickerson & Rideout, assigning him their right to redeem this interest, but never acted on it, probably because their bankruptcy made it evident that he could not get a good title in that way. There was some conversation between him and Lord about the matter, and Lord pretended to him that he would rather have his money, but afterwards, jointly with Morse & Co. and other Bangor owners acting with him, Lord procured one Wilson to purchase the right to redeem from the assignee, and then Wilson paid off the advances of Smith, Lord and Morse & Co., and held the 9-64 for the benefit of Lord, Morse & Co. and the others who joined them in the proportions in which they advanced him the money to purchase and

redeem the interest. The result was that Lord and Morse & Co. prevented the Smiths from getting more than one-half of the ship, and they themselves got control of the other half, except one small interest in one Snow, which they purchased in July last to make their half complete. The proceedings of Lord and Morse to bring about this result as to the 9-64 were artful and cunning, and they outwitted Smith, but they are not chargeable in the matter, as alleged in the answer, with any legal fraud which taints their title. Their proceedings were secret, and it was not till shortly before the filing of this libel that W. H. Smith or F. H. Smith & Co. learned that this share or 9-64 was held in the interest of Lord and Morse & Co., although it was communicated confidentially by Lord to Capt. Bartlett.

The failure of Nickerson & Rideout led to a change in the agreement between Bartlett and Lord and Morse & Co. as to the one-quarter on which they were advancing for his benefit, and by subsequent agreements it was provided that additional sums which they should become liable to pay beyond the price stipulated in the original building contract should be first repaid to them before they should convey to him the quarter interest under the agreement of June 19, 1876.

These additional amounts have never been ascertained, and cannot be so till the lien suits still pending are brought to an end.

The ship was completed and sailed on her first voyage, under command of Captain Bartlett, on or about April, 1877, and she has continued under his command from that time to this, making several voyages. She has been very successful, netting in dividends to her owners $10,000, besides paying for her copper, which cost $5,000, all in the period of sixteen months. Her cost was about $75,000. Her first voyage was from New York, and she arrived in New York again on the 17th of August last. During these voyages Capt. Bartlett has generally acted as the agent of the owners in making charters, disbursing the ship, and generally in attending to her business.

The first charter, however, was made in New York, after consulting all the other owners, by F. H. Smith & Co., who signed the charter as "Agents for the Owners," and they have received and distributed at least one remittance and have attended to disbursing some of the ship's bills in New York, and in February, 1878, rendered an account to the owners. There was some delay in making this distribution by F. H. Smith & Co., owing to some unsettled bills being out, and this delay in the receipt of his dividend was made the ground of some complaint against F. H. Smith & Co. by Mr. Lord, in his confidential correspondence with Captain Bartlett, and he requested Captain Bartlett in future to remit the share of the Bangor owners to him (Lord) direct, and not through F. H. Smith & Co., stating that there would be no impropriety in his so doing, and that there had never been any agent of the ship appointed except himself, (Bartlett). Indeed, in his letters to Bartlett, Lord constantly recurred to this idea that there had been no agent appointed, and expressed himself dissatisfied with the existing state of things, and further expressed the hope that before long they might get an agent appointed.

By all this, taken in connection with what Lord knew of the understanding at the time of signing the building agreement, and with his conduct in New York with reference to the present charter hereinafter referred to and the power of attorney held by him as hereinafter stated, I understand that his meaning was that, notwithstanding that original understanding as to F. H. Smith & Co.'s doing the business at New York and the fact known to him that F. H. Smith & Co. had from the beginning acted as agent for the owners in New York, as occasion required, yet there was no permanent appointment of an agent and that nothing had been done to bind the owners to continue the business with F. H. Smith & Co. or to prevent their appointing another agent.

But this dissatisfaction, such as it was, was not communicated to the Smiths, although W. H. Smith knew that there was some hard feeling about the old hard-pine business.

In June or July, 1878, the ship was on her way homeward for New York, and it became necessary to make arrangements for a new voyage. On the 7th of July, the captain wrote to F. H. Smith & Co. from Dungeness recommending that she be chartered to arrive for San Francisco. On the 29th of July, F. H. Smith & Co., having obtained an offer from Sutton & Co. to take her for $16,000 for a voyage to San Francisco, wrote a letter to W. H. Smith, who was then at Bangor, stating the terms of the offer and that it must be closed by August 1, and asking instructions. On the 31st of July, W. H. Smith went to see Morse, one of the Bangor owners, and showed him the letter and asked his advice.

There is some conflict of testimony between Morse and Smith, as to what took place at this meeting, but I think Mr. Smith's account the more probable of the two. Mr. Morse's comment on the offer was, that he thought there was not much money in it, but he would talk with Lord and see him again. Smith waited till late at night, and hearing nothing further from Morse, telegraphed to F. H. Smith & Co. to do what they thought best with the ship. Lord at that time was not in Bangor, and was not consulted. F. H. Smith & Co., on receipt of this telegram, on the next day, Aug. 1, signed the charter on behalf of the owners, and it was executed by Sutton & Co. Sutton & Co. requested them to keep it secret till the ship's arrival.

On the 7th of August, Lord came to New York. He brought with him a power of attorney, executed by all the libellants, authorizing him, so far as their interests were concerned, to remove the captain, and to appoint a new captain in his place, and "to change the agency, management, and control of said ship, as seems to him to be for the interests respectively, and also to settle up the accounts of the ship with F. H. Smith & Co., who have assumed to act as the agents of the said ship heretofore, and to audit their accounts;" also to sell and convey their interests, provided the whole of their interest was sold together, "it being our intention to stand together in the matter of the ownership of said vessel." This paper shows conclusively, that up to that time, F. H. Smith & Co. were assuming to be, and had been suffered by the other owners to act as agents of the ship in New York, and that Lord's declarations in his letters, about there being no agent appointed, mean only what is above indicated. His conversation with F. H. Smith & Co. indicates the same thing. After some general conversation, he asked F. H. Smith if the ship was chartered, a question which he would not have asked except of one, who had, or at least was known to him to be assuming to have some authority to act for the owners in the matter of a charter. Smith, having regard to the request of Sutton & Co., gave an evasive answer, but said she was as good as chartered. Lord went out, and soon after returned with a witness, and said to Smith that they, i. e., the Bangor owners, didn't want the ship chartered till she arrived. Then Smith told him she was chartered, and stated the terms of the charter. Lord said he was sorry. It is insisted, on the part of the libellants, that though the charter is binding on the ship, because afterwards signed by the master, yet that it is not personally binding on them, because F. H. Smith & Co. had no authority to act for them, and because, before the master signed it, they prohibited the making of the charter so far as they were concerned, or, as it is expressed in the libel, they "expressly dissented from it." There is really no essential conflict of testimony as to what passed in the interviews between Mr. Lord, acting for the libellants, and F. H. Smith & Co. on the 7th of August, and afterwards between Mr. Lord and the respondents, and Captain Bartlett, after the ship's arrival, down to the time of the commencement of this suit. And the evidence does not show, in my judgment, that the libellants expressly dissented from the charter in any other sense than this, that they found fault with F. H. Smith & Co. for having made it without consulting them. The evidence does not warrant the conclusion that, when they found it had been made under an assumed authority to act for them in common with all the other owners, they sought or desired to undo or

repudiate what was thus done in their behalf, or that they took the ground that they would not be parties in this new adventure. What they did and what they failed to do, what they said and what they failed to say, concur to this conclusion. In the first interview, Lord introduced the subject by asking Smith if she was chartered. Why did he ask that question, unless he thought F. H. Smith & Co. might have chartered her? If his pretence is true that he knew nothing about any understanding that F. H. Smith & Co. should be the agents, and that they had no existing authority as agents, he would naturally have asked him, "What shall we do with the ship?" but would not have asked him, "Is she chartered?" Again, when at the second interview he said, "Fred, we don't want the ship chartered," the language was only appropriate as addressed to one who had at least some color of authority to act for all the owners. And when, in answer, Smith said, "She is chartered," Lord's reply, which he himself testifies to, "I am sorry," was only appropriate as addressed to one who had some authority to do what was done. It expressed regret and dissatisfaction with what had been done, but recognized it as done. On his theory of total want of authority in Smith, his natural reply would have been, "Why, you can't charter the ship." Again, on the theory of the libellants, that the charter became binding on the ship only because of its being signed by the master, the natural thing for the libellants to do, if they found that Smith had without authority signed a charter which was not yet binding, either on the ship or owners, was to have taken measures to prevent its becoming binding, either by instructing Smith that it should not be presented to the master for approval, or by leaving notice to be given to the master on his arrival prohibiting him from signing it. In fact, Lord did nothing of the kind. He knew that the master had not signed it, and that he was expected to arrive in a few days. Still further, if Lord either took the ground that the charter was not binding on the ship, or on the owners whom he represented, it is hardly conceivable that he should not have made some attempt to undo what had been done, at least to the extent of notifying the charterer, whose name was communicated to him, that the charter was void, or not binding on his co-part-owners in order to avoid future complications and claims.

He did nothing of the kind, nor did he request Smith to do anything of the kind. The whole evidence tends to show that he acquiesced in what had been done as done, reluctantly, it is true, and with expressions of regret, but still that he acquiesced. It is true that he told Smith that the owners whom he represented had not been consulted, but this is not inconsistent with the intention so plainly appearing upon the other parts of the conversation. It was rather in the

way of blame or fault-finding, that in so important a matter as the chartering of the ship he had not consulted all the owners, than as a distinct assertion that, for want of such consultation, what had been done was of no validity, or that he intended or felt that he had the right to repudiate it. They got into a discussion as to the respective interests which they severally represented. Smith was under the impression that he and his father and his sister held title to a little more than half the ship. Lord told him that he represented half. I see no reason to disbelieve Mr. Smith's statement that up to that time he did not know that the title to the 3-64 part of the 9-64 on which his father had advanced to Nickerson & Rideout, had been transferred by his father, and his impression that the Smiths controlled a little more than half was evidently based on the state of the title previous to that transfer. I see no reason to believe from the testimony that the action of F. H. Smith & Co. and W. H. Smith, in the making of this charter, was actuated by any other motive than that of doing what they thought was for the best interests of all concerned; nor do I see any evidence of a design in what they did unfairly to forestall the action of their co-owners, or to commit them to a charter that they did not approve. F. H. Smith & Co. acted under what they thought was the express authority of the majority interest. The occasion was pressing. Their letter to W. H. Smith at Bangor where the other owners principally were, did not request him to see the owners, but it may well have been within their expectation that he would do so, as in fact he did; and although it can be easily pointed out, that they might have done more to obtain the opinions of all, as by writing a letter to each owner, yet I can not find that what they did was not supposed by them to be a reasonable, fair, and proper attempt under the circumstances, to communicate with the other owners before closing with the offer for a charter which they believed to be a beneficial charter, as the market then was.

Now, I think in the circumstances in which Lord found that his co-part-owners were placed, when he learned that a charter had been made on the 7th of August, especially in view of the authority which, as appears conclusively by the power of attorney held by Lord, all the owners up to that time had permitted or suffered F. H. Smith & Co. to exercise—an imperfect and temporary authority, it may be, but one never up to that time revoked; I say ·I think that he was called upon as the representative of his co-part-owners to declare himself explicitly and in terms that could not be misunderstood as to whether or not he held the charter binding, and as to whether or not his co-part-owners would join in this new adventure projected on their behalf. Yet nothing that he said or did, conveyed or was calculated to

convey to the minds of the respondents the idea that he held the charter to be void, or repudiated what had been done in their names, and on their behalf. He could not, as between himself and his co-owners, who had assumed to act in his behalf, lie by, and by the use of doubtful expressions as to his intention at that time, afterwards, in case of the success of the adventure, claim that he was entitled to share in the profits on the ground that he had bound himself, and in case of disaster defend against a claim for contribution on the ground that he had not bound himself. For aught that appears if he had declared himself not bound, his co-owners might then have procured from ·the charterer a release from the charter. Freights were still falling, and other ships could have been procured on terms as favorable for the charterer.

On the 17th of August the ship arrived. F. H. Smith & Co. presented the charter to the master, and he approved it. Afterwards, on the 22d or 23d of August, Lord came to New York again. He saw the master and the respondents. He offered to name a price at which he would buy or sell, and he offered that the Smiths should name a price at which they would buy or sell, but as regards the charter nothing occurred to alter the situation of affairs, except that he learned from the master, that the lay days under the charter would commence on the 25th of August, and he did nothing, but, so far as his action was concerned, allowed the business to proceed till the filing of this libel on the 20th day of September. In the meantime the loading of the ship had commenced, and her bills of lading were issued for about 200 tons of general cargo. The evidence is that freights have been falling ever since this charter was made; that the charter was the best thing that could have been done with the ship at the time it was made, and better than any charter that could be made now; that it is a good charter for the ship, and will bring her to San Francisco in time to avail of what seems to be a fair opportunity for business, in carrying grain from that port. Although in their conversation Lord and Morse have expressed doubt as to the charter being profitable and beneficial to the ship, they have not sustained these opinions by any evidence. The evidence is all the other way. The libel alleges that "while the vessel was at sea on a voyage to New York, the libellants notified the respondents that the vessel must not be chartered, and that the respondents agreed that some arrangement should be made between the owners of the vessel, with reference to the employment and control of her, after her arrival," and that "the respondents refuse to make any reasonable arrangement with the libellants, as to the management of her." As to the averment that the libellants notified the respondents that she must not be chartered, I find that it is not proved, but

that at the time the libellants communicated their wish that she should not be chartered, the charter was then already made, in which the libellants afterwards acquiesced. As to the alleged promise to make some arrangement about the management of the vessel, the facts seem to be as follows: At the interview on the 7th of August, Lord said to F. H. Smith that he was not satisfied with the management or with the arrangements as to the vessel. He did not then explain in what particular he was dissatisfied with the existing management. It was not said in reference to the charter, or, if it was so intended, it was not so said as to convey the idea to Smith that he meant that he wanted any different arrangement made about this charter. Understanding him to refer to the general management of the vessel, Smith told him he didn't know of anything wrong, but did not see why arrangements could not be made if he wanted it. Again, when he saw the captain, Lord told him that he was dissatisfied with the management. With the light thrown on the case by Lord's letters to Bartlett, and especially by the power of attorney which he held, executed by the libellants, it is evident that what was referred to, and which Smith could only guess at, was the matter of the agency of the vessel, a point which Lord had long had in mind, but on which he had not declared himself, for obvious reasons, to the Smiths. Now, as to this matter of the agency of the vessel in New York, and especially as to the continuance of the existing agency, such as it is, of F. H. Smith & Co., which Lord received express power from his co-part-owners, so far as he could act for them, to put an end to by a new appoint-ment of agent, it is to be observed that down to the time of filing the libel, it is not shown that the libellants, or Lord in their behalf, ever stated this point as a point of disagreement to the respondents, or to F. H. Smith & Co., or ever requested them to resign the agency, or ever proposed to the respondents to unite with the libellants in the appointment of a new or different agent; nor is there any evidence of any declaration of the respondents, or of F. H. Smith & Co. that they intend to hold on to this agency against the wishes of the libellants, or that they refuse or would refuse to join with the libellants in the appointment of an agent entirely impartial and satisfactory to both sides.

There has been, at no time up to the present, any dissatisfaction with the conduct of the master, Capt. Bartlett, on the part of any of the owners. There is no proof that the libellants have ever expressed a desire to the respondents to remove the captain, or to have a different captain appointed. The evidence is complete of his skill, and there is no proof of any want of confidence in his skill and integrity on the part of the libellants. No case is made which would justify his removal, and it is not claimed that there is. The ship was built with a view to his commanding her, as all the owners understood. He gave a year's time to superintending her construction. He has displeased the libellants by joining in resisting this application for the sale of the vessel, which would displace him from command as well as extinguish his right to become the owner of an interest under his agreement with Lord and Morse & Co., of June 19, 1876. But the libellants have suffered him to go on and sign the charter and receive cargo under it, and issue bills of lading, whereby he is personally bound, without any notice to him or the other part owners, of any dissatisfaction with him as master.

The libellants have not proposed to the respondents any different employment of the ship. So far as they have been shown to have expressed any intention as to what they would have done in place of making this charter, it is that they preferred to wait for freights to improve—to lay the vessel up till the fall.

It is proved that the market for ships is very dull, and at a forced sale they are likely to be greatly sacrificed.

The grounds of disagreement between these owners, as shown by the evidence, may be summed up thus:

(1.) They dislike Mr. W. H. Smith, because of his conduct in reference to the hard pine lien, and because they think he was unfair in regard to his agreement about not holding their interest for that lien; and their state of feeling towards him is such that they dislike to own in a ship with him, especially where he holds control of one-half the vessel.

(2.) They are dissatisfied with having F. H. Smith & Co. acting longer as agents of the vessel in New York, because they are identified in interest with W. H. Smith, because they were negligent in making a remittance, and because they made the charter without consulting the libellants, and because they (the libellants) prefer to have another agent disconnected from the Smiths—but this ground of dissatisfaction has never been made a subject of discussion between the parties, and before bringing this suit they never attempted to agree on any other agent.

(3.) The charter under which the vessel now is, was made without consulting all the libellants. The charter, however, is admitted to be binding on the ship, and has been shown to be binding on the libellants, by their acquiescence, and by their not expressly dissenting therefrom.

In any view that is taken of the charter, whether binding only on the ship or, by their acquiescence, on the libellants also, the disagreement as to the charter between these parties is not such as prevents the ship from going to sea under this charter. In the case of The Seneca, [Case No. 12,670,] neither

party could, "otherwise than tortiously," that is, otherwise than by some act in violation of the rights of others, take the ship to sea.

In this case, neither party can "otherwise than tortiously" prevent the ship from going to sea. This is obviously so, if all parties are bound by the charter. It is equally so if the ship is bound to the charterer. The libellants may have their right to damages, but I do not see how they could now detain the ship. Again, these libellants, even if their right to separate themselves in this adventure survives their acts as above set forth, cannot, on the principles recognized in the case of The Seneca, [supra,] having no employment of the ship to propose on their part, and having wholly failed to show that the enterprise proposed by respondents is not what the ancient codes cited call "a probable design," that is, a well planned and proper enterprise, and one fit for the ship to undertake, are not entitled to prevent the use of the ship by the other half-owners.

As to the alleged dissatisfaction with the agency of F. H. Smith & Co., that clearly would not prevent the use of the vessel, so long as there is a competent master, and in this case it is no obstacle to her going to sea under this charter. And in point of fact, the parties have never disagreed about this matter, since there has been no attempt to agree, and the very point of dissatisfaction urged was never made known to the respondents so that they were called upon to take ground on the question.

As to the dislike of, and distrust towards W. H. Smith, this is not a disagreement as to the employment of the vessel, and though, if it continues to exist, it may be the cause of future disagreement, yet in itself, as a mere feeling, obviously it is of no account in this legal controversy.

It is, however, insisted, that the actual state of feeling between these parties is such, that a separation must be effected some time, if not now—that not to give them relief now is merely to prolong the controversy between them; that it will only compel them to apply to the court in California, or here again on the ship's next return to this port. The answer is obvious enough. This power to order a sale is a power to compel property owners to part with their property against their will. It is, therefore, an extreme resort justified by necessity only, from a regard, first, to the interests of commerce, and, secondly, to the relief of the parties from the distressing predicament which makes their property useless in their hands. The authorities cited above and the reason of the thing clearly show that this is the nature of the power. Now that necessity does not exist, either as to the relief of the public, or of the parties, till they have reached a point of actual present inability, by reason of the disagreement, to use the vessel. So long as that case of necessity is merely threatened, and lies in the future, it is as if it

did not exist, and it may, in fact, never arise. Before this ship reaches San Francisco many things may happen to prevent this deadlock occurring. The ship may be lost on the voyage. When she reaches there her true policy for the next voyage may be so obvious, that there will not be two opinions about it. The parties may reconcile their differences. It would seem that there ought not to be any great difficulty in disposing of what seems to be the principal point which the libellants insist upon, the establishment of an agency for the ship in which both parties can concur. A little more frankness and candor on the one side in dealing with the matter, and no great sacrifice of interest or feeling on the other, would save these former friends from further litigation and certain loss.

The libellants probably can, if they are bent upon doing so, at the end of this voyage, bring about a dead-lock which shall tie up the ship so that an admiralty court will have to do for the parties what they ought to do for themselves; but this court ought not to anticipate or attempt to provide against such a necessity.

Another question of very great interest, bearing on the nature of this action, was raised in this case. Upon the trial Captain Bartlett was admitted as a party respondent, and he joined in the answer denying the main facts on which the right to the relief prayed for was based. The respondents offered to show that Captain Bartlett had an equitable interest in the quarter of the ship held by the libellants, Lord and Morse & Co., being the same quarter taken in their names for ⅛th each, and subscribed for upon the building contract, in accordance with the agreement between Bartlett and Lord and Morse & Co., hereinbefore recited, and dated June 19, 1876.

It was not conceded by the learned counsel for the libellants that Bartlett had such an equitable interest in the quarter of the ship; but, on the contrary, it was claimed by him that the agreement of June 19 was an agreement to sell and convey an interest of Lord and Morse & Co. to Bartlett, on certain conditions, and not an agreement to hold as collateral and by way of security an interest belonging to Bartlett; and it was also claimed that, the time having expired within which Bartlett was to make his payment of one-half of the price, and notice having been thereupon given by Lord and Morse & Co. that his right under the contract was forfeited, such equitable interest had been cut off.

As to the question whether Bartlett has a redeemable interest in the quarter of the ship, it is only necessary for me to say that I have come to the conclusion, as well from the terms of the agreement of June 19, 1876, as from the other evidence of the understanding of the parties, their correspondence, their acts, and their testimony,

that the relation between Bartlett, and Lord and Morse & Co. was that of debtor and creditor, and not that of vendee and vendor; that the interest was held as his, as collateral security for the debt, and therefore was not extinguished by the notice, but that there is no immediate right to redeem, because the amount of the debt cannot yet be ascertained, and his right to redeem is subject to be cut off by a sale under the power contained in the contract.

Aside from this answer made by the libellants' counsel as to Bartlett's interest, it was also insisted that the evidence was incompetent on the ground that in this action the court could consider and take notice only of the legal and record title to the ship; that as, in actions of possession, the court would take no notice of equitable interests, but would decree possession of the ship to those holding the majority of the legal title, so here those having a moiety of the legal title were entitled as of right to a sale, if the essential disagreement between the owners of the two moieties of the legal title existed. The evidence was admitted on the ground, that this power of the court is one to be exercised in its discretion, and with a regard to all the circumstances of the case, and with a view to the effect of the sale on the interests of all concerned, and that it is not a fixed legal right of moiety owners of the legal title, to have a sale decreed upon presenting to the court a case of disagreement as to the employment of the ship.

It is true the legal title to the major part carries with it the right to the possession of the ship, and that right must be recognized and enforced in suits for possession, and the rule is of great convenience and beneficial to commerce in the simplicity and ease with which it is applied. There seems to be no analogy, however, between a right to the possession as an incident of the legal title in a major part, and a right to have a court exercise a power of sale as an incident to legal ownership of a moiety. One is easily conceivable as a personal right; the other is not.

Moreover, if this were an absolute right inhering in a moiety ownership, to have the court order a sale, it is easy to see that it would be not beneficial but most injurious to the interests of commerce, from the ease with which it would be made the instrument of oppression. Thus, if the right is absolute and the court must order a sale, the court could add no condition which might defeat a sale. If it appeared ever so clearly that the libellants were rich and the respondents without means, except their interest in the ship, and the state of the market such that no other bidders could be found, and even that the libellants had brought about the disagreement to force a sale, intending themselves to buy for almost nothing, and thus drive the other party out of their property, yet, on the theory proposed, a sale must follow with all the absolute certainty with which possession follows the legal title, and the court could not even impose, except by consent of parties, as a condition of the decree, an upset price, since that would be to limit, restrict, and impair an absolute right. Unlike the rule that the right of possession adheres in the legal title to the major part, such an absolute right to a decree of sale would impair the value of all property in ships, by rendering insecure the owners' hold upon it. In truth, this power seems to be a power vested in courts of admiralty, from the necessity of the case, from a regard of the law as well to the public interest, that ships should continue to plough the sea, as to private interests that the parties may recover the beneficial use of their property. From the nature of the power, to be beneficial in its exercise, it should be used with discretion, with caution, and upon a careful consideration of all those interests, public and private, involved. It should not be tolerated that the power be invoked for purposes of oppression. It follows, that the court must receive evidence of all the circumstances that may possibly affect its discretion.

If it appears that the libellants really hold their moiety in trust for the respondents, owing them a duty to follow their directions in the management of the ship, it would hardly be a proper exercise of the power to grant the prayer of the libellants against the protest of the respondents; and in such a case, even if the public interests might suffer to the extent of having one ship idle, that would be more tolerable than to do so great a private wrong. Whether the protection of Captain Bartlett's interest from the ruinous effect of a sale, if his interest be such as he claims, would be a sufficient ground for withholding the decree, if the libellants were otherwise entitled to it, it is unnecessary to decide. But the evidence was properly received as evidence of circumstances bearing on the exercise of the discretion of the court. Libel dismissed, with costs.

[NOTE. For instances in which admiralty courts have refused to order the sale of vessels at the instance of minority owners, see The Ocean Belle, Case No. 10,402; Davis v. The Seneca, Case No. 3,650.]